Christopher H. KAISER, Petitioner,

v.

David L. WRIGHT and Donald M. Chaplin, d/b/a Chaplin & Co., Respondents.

No. 79SC324.

Supreme Court of Colorado, En Banc.

May 26, 1981.

<br>

---

Weinshienk, Miller, Borus & Permut, Barry Permut, Denver, for petitioner.

Oates, Austin, McGrath & Jordan, Ronald D. Austin, Aspen, for respondents.

LOHR, Justice.

Christopher H. Kaiser, the petitioner, commenced this action to recover $20,000 paid as earnest money on a contract to purchase a residence in Vail, Colorado, owned by David L. Wright. Wright, and Chaplin & Company, the real estate broker which held the $20,000 deposit, were named as defendants. We granted certiorari to review the decision of the court of appeals affirming the trial court's judgment that Wright was entitled to retain the earnest money as liquidated damages when Kaiser withdrew his tender of the unpaid purchase price at the closing after receiving only oral assurances that written releases of two liens which encumbered the property would be forthcoming. We reverse the judgment of the court of appeals and remand with directions.

The trial court's findings and the uncontroverted evidence in the record are the sources of the following factual background.

### THE CONTRACT

On August 31, 1976, Kaiser and Wright entered into a written contract, on a printed receipt and option form, whereby Kaiser was to purchase Wright's property in Vail. Kaiser paid $20,000 as earnest money to the real estate agent, William R. Abraham of Chaplin & Company, who had shown the property to Kaiser. The purchase price was $175,000. In addition to the earnest money, approximately $45,000 in cash was to be paid at the time of closing. The balance of the purchase price was to be represented by two promissory notes totalling $110,000, secured by deeds of trust on the property, to be executed by Kaiser. Paragraphs 4 and 11 of the contract are particularly relevant to this case. They provide as follows: [1]

---

1. The underlined language was added to the printed form by the parties.

"4. Title shall be merchantable in the seller. Subject to payment or tender as above provided and compliance with the other terms and conditions hereunder by purchaser, the seller shall execute and deliver a good and sufficient <u>general</u> warranty deed to said purchaser on Nov. 8, 1976, or, by mutual agreement, at an earlier date, conveying said property free and clear of all taxes, except the general taxes for 19<u>76</u>, payable January 1, <u>1977</u>, and except <u>a 1st Deed of Trust payable to the Suburban Trust and Savings Bank of Chicago, and a loan payable to Alma S. Wright which Seller agrees to pay subject to the provisions of para. 11 of this contract</u>. free and clear of all liens for special improvements now installed, whether assessed or not; free and clear of all liens and encumbrances except easements for telephone, electricity, water and sanitary sewer, and except <u>any resevations, (sic) restrictions and/or easements of record</u>. and subject to building and zoning regulations, and restrictive covenants of record. Any encumbrance required to be paid may be paid from the proceeds of this transaction.

11. Additional Provisions: <u>The parties herein agree to establish and (sic) interest bearing account for pupose (sic) of depository (sic) of the earnest money deposit in the amount of $20,000.00 and that the interest earned on this account be credited to the Purchaser at the time of closing. Also, the parties herein understand that this contract is subject to approval of the lenders indicated in paragraph 4, such approval to include but not be limited to agreement by said lenders to release that portion of subject loans so that the Seller can and will convey the described property free and clear at the time of closing</u>."

Paragraph 9 of the contract stated that time was of the essence.

Pursuant to paragraph 10 of the contract, Wright supplied Kaiser with a current commitment for title insurance well before the scheduled closing. Among the encumbrances listed in the commitment which would have constituted exceptions to the policy if not released were the liens of Suburban Trust and Savings Bank and Alma S. Wright which were referred to in paragraph 4 of the contract. The respective original principal amounts of the obligations secured by these liens were $192,000 and $120,000.

### EVENTS PRIOR TO CLOSING

On September 22 or 23, 1976, Kaiser left Colorado for an extended business trip. On October 7, while still out of state, Kaiser telephoned Abraham and expressed reluctance to complete the purchase. Although there was conflicting evidence as to the exact conversation, the trial court found that Abraham took Kaiser's statements to mean that he was not going to proceed with the purchase. Abraham then notified Wright's attorney to this effect.

After receiving Abraham's call, Wright's attorney drafted a letter claiming that Kaiser had anticipatorily repudiated the contract. He addressed and sent this letter to a representative of Vail Associates, Inc., the listing broker, with a copy to Wright.[2] No copy of this letter or notice of its substance was ever communicated to Kaiser. Wright's attorney testified that the letter was not sent to Kaiser because he knew Kaiser was not in Vail and so would not receive the letter.

During the early part of October, Kaiser also called an attorney in Denver who had previously performed legal services for him. Kaiser sought the attorney's advice about being relieved of his purchase obligation under the contract. Kaiser's attorney asked for and later received copies of the contract and title commitment. After reviewing these documents, Kaiser's attorney advised Kaiser that the contract was binding and that he was obligated to complete the purchase or forfeit the $20,000 deposit. Thereafter, Kaiser asked his attorney to make arrangements to obtain funds to be distributed to Kaiser from a trust in New

---

2. The trial court found that the letter was also sent to Abraham. The record does not support that finding. According to Abraham's testimony he received no such letter.

York so that he could have the necessary money available at the closing.

Also during late September or early October, Wright's attorney entered into negotiations to procure releases of the liens which had been expressly noted in the contract.[3] Unwritten agreements were reached[4] and the lienholders began preparing the necessary documents. After Wright's attorney received Abraham's call on October 7, however, he notified the lienholders to stop work on the releases. Nevertheless, in late October and early November Wright's attorney prepared the other documents necessary for closing. On November 2, Wright's attorney sent a letter to Abraham offering to grant Kaiser extra time to effect the closing, but stating he had been unable to learn whether Kaiser intended to complete the transaction. That letter also stated that agreement had been reached to obtain the necessary releases "in order that the property may be transferred free and clear."

On November 4 or 5 Kaiser returned to Vail. He again spoke with his attorney about getting the trust fund assets liquidated and to Vail in time for the closing and about the possibility of obtaining alternative financing. On November 5 or 6 Kaiser received a phone call from Wright's attorney who asked Kaiser whether he wanted an extension of time to close. Kaiser said he did not and informed Wright's attorney that he was represented by counsel and that any further questions should be directed to counsel.

Wright's attorney and Kaiser's attorney talked by telephone sometime on November 5, the Friday before the scheduled Monday closing. Kaiser's attorney told Wright's attorney that to the best of his knowledge Kaiser intended to proceed with the closing on Monday. On November 5 Wright's attorney also heard from Abraham, who related that he had talked to Kaiser and had been informed that Kaiser intended to close on Monday. Wright's attorney than got in touch with representatives of the lienholders to see if the releases could be obtained. He found that he could obtain the releases in time only by flying to Milwaukee and Illinois to pick them up. Wright's attorney decided not to do this. In the course of talks with the representatives of the lienholders the possibility of telegraphic confirmation of the releases was discussed, but no telegrams were requested nor were any sent.

---

3. The obligations secured by the liens were a promissory noted from David L. Wright to Alma Smith Wright dated April 14, 1975, in the original principal amount of $120,000, and a promissory note from David L. Wright to Suburban Trust and Savings Bank dated August 15, 1975, in the original principal amount of $192,000. No useful purpose would be served by a description of the complex details of the contractual relationships with respect to these liens as reflected by the relevant exhibits.

4. The complexity of the release agreements and their conditional nature are relevant in considering Wright's ability to convey clear title. The agreements are reflected in letters written by representatives of the lienholders subsequent to the November 8 closing date and had not been reduced to writing before closing.

Suburban Trust and Savings Bank agreed to furnish a written release upon receipt of $51,276.78, the net proceeds which Wright would have received had the transaction closed. However, Suburban required that after the closing Wright assign to Suburban Kaiser's note and deed of trust for the $110,000 balance of the purchase price and pay Suburban an unspecified amount necessary to reduce to $110,000 Wright's original $192,000 obligation to Suburban on the August 15, 1975, promissory note. Only then would Suburban *subordinate* its first deed of trust on Wright's Aspen property to the deed of trust of the holders of the Alma Smith Wright interest on that Aspen property.

The holders of the Alma Smith Wright interest agreed to release their lien on the property to be sold to Kaiser only after the *satisfaction* of Suburban's first deed of trust on Wright's Aspen property.

There is some question whether Suburban's *subordination* of its lien on Wright's Aspen property would satisfy the requirement of the holders of the Alma Smith Wright interest that the Suburban lien be *satisfied*. Moreover, the payment of an unspecified amount by Wright to reduce his obligations to Suburban to $110,000 necessarily had to be made from funds other than those to be obtained from the sale of the Vail property to Kaiser. The record is devoid of evidence of the amount of money necessary or whether Wright had the funds to pay that amount.

## THE CLOSING

The closing was to take place at 3:00 p. m. on Monday, November 8 in the Vail office of the Transamerica Title Insurance Company. An employee of Transamerica was to act as the closing officer.[5] After the parties assembled and the closing documents had been reviewed, Kaiser's attorney requested a recess. During the recess, Kaiser and his attorney obtained the funds necessary to tender under the contract.[6] Also during the recess Wright's attorney and the Transamerica agent spoke by telephone with representatives of the lienholders.

When the closing reconvened later that afternoon, Kaiser's attorney asked for the releases of the encumbrances reflected on the title commitment. Wright's attorney advised that he did not have the releases. Kaiser's attorney then asked what documentation was present to assure that the title requirements could be satisfied.[7] Wright's attorney said there was nothing in writing but that he had confirmed by telephone that the lienholders had agreed to provide the releases. The evidence is conflicting on whether the Transamerica closing officer also confirmed to Kaiser this telephonic information regarding the releases. Kaiser's attorney then tendered a cashier's check in the proper amount and demanded performance in accordance with the contract, including conveyance of title free and clear of the liens. Wright's attorney said clear title could not be conveyed at that time because of the unreleased liens. Wright did not request an extension. Kaiser and his attorney then withdrew the tender, declared Wright to be in breach, and left the closing. Kaiser's attorney subsequently sent a letter on behalf of Kaiser to Wright and to Chaplin & Company demanding that the earnest money be returned. The earnest money was not returned and Kaiser brought this action against Wright and Chaplin & Company to recover that money.

## DISPOSITION IN THE LOWER COURTS

Relying on letters sent by representatives of the lienholders after November 8, the trial court found that the encumbrances could have been released upon payment of the net proceeds which Kaiser was to tender under the contract. The court concluded that Wright was in a position to close the transaction and had substantially performed his contractual obligations since he had made preparations to obtain the releases with those proceeds. The trial court held that the actual releases did not have to be presented to the buyer at the closing. The court then stated that because Kaiser had been absent from the state until just prior to the closing, and apparently because he had anticipatorily repudiated the contract, he was estopped from demanding that the actual written releases or written agreements to release be present.

The court of appeals affirmed. Although that court did not reach the issue of estoppel, it concluded that there was sufficient evidence to support the trial court's findings that the encumbrances on the Wright property could have been released upon payment of the net proceeds. Because the contract specifically allowed the seller to pay encumbrances from the proceeds, the court of appeals affirmed the trial court's conclusion that Wright had substantially performed his obligations under the contract and was entitled to retain the earnest money as liquidated damages.

---

**5.** Transamerica's limited function was to handle the mechanics of the closing. The title insurance commitment was issued by Chicago Title Insurance Company.

**6.** Kaiser's New York trust assets had not been liquidated in time for the closing. Kaiser's attorney, therefore, obtained a loan from a Denver bank and had the proceeds transferred to a bank in Vail. Kaiser was to repay the sum immediately upon the arrival of his money from New York.

**7.** The record is not clear whether Kaiser and his attorney learned definitely that Wright had no documentation with respect to release of the liens before the recess in the closing.

## I.

■ Kaiser claims that Wright was required to have at least written confirmation that the lienholders had agreed to release the liens and that those releases were forthcoming upon payment of the proceeds available from the closing in order to satisfy Wright's obligation to convey merchantable title at the closing. We agree with this contention.

■ The contract was entered with the express recognition that there were liens on the property for which releases had to be obtained. Paragraph 11 of the contract specifically states that the contract is subject to an agreement by the lienholders "to release that portion of [the] subject loans so that the Seller can and will convey the described property free and clear at the time of closing." The plain meaning of this language is that Wright was required to obtain the necessary releases by the time of closing and to convey title free from those liens at the closing.[8]

■ Wright, however, seeks to take advantage of the general rule that a vendee cannot elect to rescind a contract to purchase property on the ground that encumbrances render title unmerchantable where the encumbrances are of such character and amount that the unpaid purchase money can be applied to remove them. *E. g., Sachs v. Owings*, 121 Va. 162, 92 S.E. 997 (1917); *see Garbarino v. Union Savings and Loan Association*, 107 Colo. 140, 109 P.2d 638 (1941); *see also Lone Star Development Corp. v. Miller*, 564 F.2d 921 (10th Cir. 1977) (applying Colorado law); *see generally* Annot. 53 A.L.R.3d 678 (1973).

■ In *Sachs v. Owings, supra*, the court explained that the general rule is applicable "where the amount of the encumbrance is definite, does not exceed the unpaid purchase money due, is presently payable ... and its existence is not a matter of doubt or dispute, or the situation is not such with respect thereto as to expose the vendee to litigation on the subject." *Id.* at 170, 92 S.E. at 1000. Thus, where a contract requires concurrent performances (the vendee to deliver the purchase price in exchange for the vendor's conveyance of merchantable title to the property), it has been stated that the vendor need not satisfy a lien which burdens a title to property out of his own funds prior to closing "[s]o long as he is prepared with the use of the purchase money to obtain substantially contemporaneous release of the outstanding liens." *See Robeson-Marion Development Co. v. Powers Co.*, 256 S.C. 583, 586, 183 S.E.2d 454, 455.

■ Wright claims that because he was ready to effect the releases upon receiving the portion of the unpaid purchase price to be paid at closing, Kaiser could not withdraw his tender without breaching the contract. We hold that the rule cited by Wright is not applicable to the facts of this case.

The Alma Smith Wright lien secured an obligation in the original principal amount of $120,000. The Suburban Trust and Savings Bank lien secured an obligation in the original principal amount of $192,000. Neither loan was to be paid in full by application of the proceeds of the sale of Wright's property to Kaiser. Rather, as detailed in footnote 4, *supra*, the complexities of the release agreements appear to have their source in the need of the lenders to readjust their security interests in other property owned by Wright to maintain adequate security for the remaining amounts of Wright's obligations after release of the property which Kaiser was to buy. This is not the typical case where the proceeds of a sale are sufficient to obtain release of liens by payment in full of the underlying obliga-

---

8. Because the liens of Suburban Trust and Savings and Alma S. Wright were expressly noted in the contract and because the contract specifically provided that the property was to be conveyed free and clear of such liens at closing, paragraph 10 of the contract, which required the buyer to give the seller written notice of defects which rendered title to the property unmerchantable and thirty days in which to cure such defects, required no additional notice be given as to the liens in question. Compare this case with *Rankin v. McFerrin*, Colo.App., 626 P.2d 720 (1980).

tions. Compare this case with *Sachs v. Owings, supra.*

■ The trial court's findings that the lien releases could be obtained upon payment of the net proceeds of the sale is not supported by the record. It is uncontroverted that the letters furnished by the lienholders after the aborted closing simply reduce to writing the terms of their pre-closing oral agreements for releasing the liens.[9] Those agreements were conditional, and Wright did not establish that all the essential conditions could have been satisfied. Before the holders of the Alma Smith Wright lien would release, they required that the Suburban deed of trust on Wright's property in Aspen be satisfied. Before Suburban would subordinate[10] its lien on the Aspen property, it required that the balance of its loan to Wright in the original principal amount of $192,000 be reduced to $110,000. There was no evidence of the amount of money necessary in addition to the proceeds of the sale of Wright's property to Kaiser to accomplish this reduction. There was no evidence that Wright had such money. In short, and without analyzing the ability of Wright to comply with the other detailed requirements of the release agreements, it was not established that the liens could have been released by application of the proceeds of the sale.

Kaiser and his counsel were never made aware of the complex and conditional nature of the release agreements. They were told only that the releases would be available after closing and were asked to accept the oral representations of Wright's lawyer to that effect. There is no evidence that Kaiser or his counsel was made aware prior to closing that the liens could not be released at the closing.

■ We agree that if a buyer can be furnished suitable assurances that by application of a definite sum no greater than the unpaid purchase price at closing an encumbrance will be released unconditionally, the buyer cannot contend successfully that the existence of the encumbrance causes a breach of the seller's agreement to convey merchantable title. Such a situation, however, does not exist in this case.

Here, Kaiser came to the closing and tendered the purchase price. In return Wright could give only his oral assurances that the releases for the liens encumbering the property would be forthcoming. Wright did not disclose any details of the release agreements. Given the complex and conditional nature of those agreements, Kaiser was not required to accept an encumbered title trusting to the good faith and financial ability of Wright to obtain release of the liens at some future time. *See Robeson-Marion Development Co. v. Powers Co., supra; Johnson v. Herbst,* 140 Minn. 147, 167 N.W. 356 (1918).

■ While it is true that a closing may be so structured that its details may take hours or even days to complete and yet constitute an integral transaction in which the required performances are deemed concurrent, *Robeson-Marion Development Co. v. Powers Co., supra; Kadow v. Cronin,* 97 N.J. 301, 116 A. 427 (1922), here the parties made time of the essence. Merchantable title was to be conveyed on the day of closing. Wright did not request an extension but instead insisted that Kaiser should accept Wright's attorney's oral representations that the releases could be obtained. No contractual provision was made for tendering the purchase price in escrow until the releases could be obtained. Kaiser was not obligated to agree to such an arrangement at the closing, particularly where Wright did not produce written proof that an agreement to obtain the releases had been reached. Contrary to the lower courts' conclusions, we find that the uncontroverted facts in the record reflect that

---

9. We are not bound by the trial court's interpretation of those letters. *See Grossman v. Sherman,* Colo., 599 P.2d 909 (1979); *Sentinel Acceptance Corp. v. Colgate,* 162 Colo. 64, 424 P.2d 380 (1967).

10. The question whether *subordination* is equivalent to *satisfaction* is noted in footnote 4, *supra.*

Wright was not sufficiently prepared at closing to perform his obligations under the contract so that Kaiser could be assured of obtaining the merchantable title for which he bargained. Therefore, Kaiser did not forfeit the earnest money by withdrawing the tender of the unpaid purchase price and declaring a breach of contract. *See O'Meara v. Saunders*, 199 S.W.2d 689 (Tex. Civ.App.1947).

■ We also conclude that Wright was not excused from his obligation to be fully prepared in time for the closing by the conduct of Kaiser, either in his anticipatory repudiation or his absence from the state prior to the closing. The trial court specifically concluded that Wright had waived his rights to assert that Kaiser had repudiated the contract. That conclusion is not contested on appeal. The repudiation occurred more than one month prior to the scheduled closing. When Wright chose to go ahead with the sale to Kaiser on the agreed date, he was required to complete all the acts necessary to fulfill his obligations under the contract. This he failed to do.

■ The trial court concluded that Kaiser was estopped to require the presence of written releases at the closing. There is no evidence in the record that Kaiser ever indicated that lien releases, or suitable assurances that such releases would be forthcoming on payment of the purchase price, need not be present at closing. Indeed, there is no evidence that Kaiser was aware that Wright would have any difficulty obtaining the requisite documentation. The elements of estoppel are not present here. *See Jacobs v. Perry*, 135 Colo. 550, 313 P.2d 1008 (1957).

The judgment of the court of appeals is reversed and this case is returned to that court for remand to the trial court with directions to vacate the judgment previously entered and to award judgment in favor of the plaintiff and against the defendants in the amount of $20,000 plus interest.[11]

11. The trial court found that the parties stipulated that interest earned on the $20,000 deposit be awarded to the prevailing party. On re-

mand, the trial court should implement any such applicable agreement.